## BAKER v. PAXTON
(No. 1087; Decided May 8, 1923; 215 Pac. 257)

TAXATION — COMPLETION OF ASSESSMENT — STATUTES — EQUALIZATION OF PROPERTY FOR TAXATION — STATE BOARD OF EQUALIZATION — PROPERTY CLASSIFICATION FOR TAXATION — COUNTY BOARD OF EQUALIZATION — INJUNCTION — CONSTITUTIONAL LAW — NOTICE — UNIFORMITY OF TAXATION — PROCESS OF LAW — RULES AND REGULATIONS IN TAX PROCEEDINGS.

1. Under Const. Art. 15, § 10, and Comp. St. 1920, §§ 1515, 2776, 2787, 2788, 2792-2798, 2810, and 2813, the county assessment roll is not to be sent to the State Board of Equalization until the county board has completed all

adjustments at its July meeting, and the roll is not complete or final, so as to authorize tax levy, until acted upon by state board.

2. Comp. St. 1920, §§ 2787, 2788, requiring tax levy to be made on the first Monday in September and the assessment roll to be turned over to the county treasurer by the third Monday are directory only, and if levy is made and roll delivered so as to give the taxpayer reasonable opportunity to pay taxes before they become delinquent he has no ground for complaint.

3. As the equalization of assessments of property by classes is adapted to further a just and equal distribution of the burdens of taxation, legislation tending in that direction should be liberally rather than strictly construed.

4. Though Comp. St. 1920, §§ 2757, 2775, 2776, mention no classes of real estate other than lands in general and town lots, the State Board of Equalization under Section 2810, may classify lands for purpose of equalization especially as reports of tax commissioners prior to 1919 showed such classification.

5. Under Comp. St. 1920, § 2810, authorizing the State Board of Equalization to make rules and regulations, it has ample power to require that returns by county boards shall contain a showing of the various classes of lands adopted by it.

6. In classifying lands for purpose of equalization under Comp. St. 1920, § 2810, the classification should not be so minute as to evade requirement for notice before changing individual assessments, nor so broad as to confuse classes having no relation but must be reasonable and adapted to effectuating uniformity.

7. That the board of county commissioners upon receipt of an order of the State Board of Equalization increasing valuation of classes of lands ordered the county assessor to carry it out without convening as board of equalization was a mere irregularity, and not ground for injunction against the tax.

8. Though the classification of land for assessment in different counties is not uniform, it cannot be assumed, without evidence, that local officers will report lands in classes to which they do not belong, or that if its blank form is not strictly complied with the state board cannot treat the property under one of the classes adopted by it.

9. That the State Board of Equalization, after ordering an increase of all grazing lands in the county, increased only

one of two classes of grazing lands adopted by the county authorities, though doubtless illegal, will not support a suit for injunction against the tax by one whose land was not grazing land.

10. In a suit to enjoin collection of taxes for an alleged illegal increase of valuations under an order of the State Board of Equalization where there was no allegation of illegal discrimination and no relief asked by reason thereof, the question of illegal discrimination by the county board of equalization *held* not before the court, especially as the other plaintiffs were not interested therein.

11. Under Const. Art. 15, § 10, as to powers of the State Board of Equalization, in connection with Section 11, requiring uniform assessment, the legislature had power to authorize such board to equalize valuations for other purposes than the state tax, as is done by Comp. St. 1920, § 2810.

12. A horizontal increase by the board of equalization in valuation of all property, or of a class or classes of property, without notice to taxpayers, under Comp. St. 1920, § 2810, does not deny due process of law.

13. While the law does not specifically provide that a taxpayer may appear before the State Board of Equalization, enter his complaint, and be heard, the right is implied.

14. Though Comp. St. 1920, § 2810, authorizes the State Board of Equalization to adopt rules and regulations, failure to adopt such rules, other than by informal adoption of a uniform blank for returns of assessments, *held* to give taxpayer no ground for injunction against the tax.

Error to District Court, Platte County; Wm. C. Mentzer, Judge.

Action by William A. Baker and others against Robert F. Paxton, as county assessor and others to enjoin the collection of taxes. There was a judgment for defendants, and plaintiffs bring error.

C. A. Paige and Corthell, McCullough & Corthell, for plaintiffs in error.

The period for assessment had expired at the time the state board ordered the increase in valuations complained of; (2794-2798 C. S.) and other revenue laws cited. Prior to 1909 county assessors and county boards controlled the

entire process; then followed the commissioner of taxation, (Laws 1909 page 108,) and in turn increased powers of the State Board of Equalization. (C. S. 2810;) the state board can act only through the county board; the authority of the county board ends at the close of its July meeting; 2810 C. S did not repeal prior statutes on the subject. (Cattle Co. v. Baird, 8 Wyo. 144; Hagett v. Hurley, 40 Atl. 562; Manuel v. Manuel, 13 O. St. 458; St. v. R. R. Co., 81 Vt. 459; Webb v. Ritter, 54 S. E. 484; Lowe v. Water Co., 96 Pac. 379; St. v. Hocker, 98 Pac. 964.) The constitution and statutes on the subject should be harmonized. (People v. Pitcher, 138 Pac. 509; Burton v. Coal Co., 18 Wyo. 362.) Tax proceedings are *in invitum* and are strictly construed. (Hecht v. Boughton, 2 Wyo. 385, 399; Mathews v. Blake, 16 Wyo. 116, 125; Bailey v. Smith, (Ill.) 52 N. E. 948, 949; Walton v. Moore, (Ore.) 113 Pac. 58, 59; Mattox v. Stephens, (Md.) 39 N. E. 480; Lamberida v. Barnum, (Tex.) 90 S. W. 698, 699; C. B. & Q. R. R. v. People, ex rel. Sonnet, (Ill.) 72 N. E. 1105, 1107,) and not extended by implication. (St. v. Thomas, (Utah) 50 Pac. 615, 618; Prairie Oil & Gas Co. v. Cruce, 147 Pac. 152, 155; Bell v. Meeker, (Ind.) 78 N. E. 641, 644; Orr v. St. Brd. (Ida.) 28 Pac. 416, 419; St. v. Vaile, (Mo.) 26 S. W. 672.) Tax authorities have only such powers as are conferred by statute. (St. v. R. R. Co., 212 S. W. 317; Horton v. Driscoll, 13 Wyo. 66; St. v. Cage, 176 S. W. 928.) The board of county commissioners and board of equalization are distinct and separate; the county board of equalization cannot raise an assessment after the time limited for its meeting. (Napa Bnk. v. County, 120 Pac. 449; Wolfenden v. Brd., 67 S. E. 319; Farmers Co. v. Mc-Donald, 150 N. W. 640; People v. Pitcher,138 Pac. 509; Sparkman v. St., 71 So. 34; San Diego Co. v. Brd., 127 Pac. 153; Espalla v. County, 73 So. 761; Waters Oil Co. v. Roberts, 131 S. W. 205; People v. Neff, 156 (N. Y.) 701; Barkley v. Dale, 73 N. E. 325; N. J. Zink Co. v. Brd., 56 Atl. 138; Brothers v. Beck, 75 Miss. 482; Auditor v. Sparrow, 74 N. W. 881; St. v. Brd., 127 Pac. 727.) The statutory period

for completing assessments expires with the July meeting of the county board, with the exception of assessments of railroad and other property by the state board; the only authority for classifying property for taxation is found in Secs. 2757, 2775 and 2776 C. S.; the classifications involved in this case were unauthorized. (Bell v. Meeker, 78 N. E. 641; Gray v. Foster, 92 N. E. 711; Ore. Co. v. Croisan, 30 Pac. 219; Campbell v. Bnk., 76 N. W. 10; St. v. Thomas, 50 Pac. 615; St. v. Empanger, 76 N. W. 53; St. v. Vaile, 122 Mo. 33.) An increase of an unauthorized class of property is an unlawful discrimination. (Grt. N. R. R. v. County, 223 Fed. 198,) and in conflict with the principle of uniformity. (Hawkins v. Mangrum, 28 So. 872,) even the legislature is restricted in its power of classification to subjects which possess the characteristics of uniformity, (Puget Sound Co. v. Seattle, 201 Pac. 449,) the classification here attempted, conflicts with Sect 2769 C. S., and Const. Art. I, Sect. 28, (Marsh v. Supr's., 42 Wis. 502.) The state board's action operated to increase individual assessments without notice or opportunity to be heard, and in such case notice is required, (2810 C. S.) (Mayor v. Brd., 67 Atl. 38; Scott v. Barr, 26 N. E. 891; R. R. Co. v. Minn., 159 U. S. 526; Paulson v. Portland, 149 U. S. 30; Bowan Hicks Co. v. Aden, 36 So. 313,) a statute of similar purport, was considered and criticized by the Supreme Court of North Dakota, (St. v. Leech, 157 N.W. 492,) Sect. 2810 C. S. should receive a construction so restrained and adapted to other coordinate legislation as to remove the grounds of criticism, found in the North Dakota decision; the state board omitted to adopt necessary rules as required by Sec. 2810 C. S., the power is analagous to that delegated to municipal corporations requiring the execution of certain powers by ordinances; (28 Cyc. 275,) (Public Service Co. v. Camden, 112 Atl. 421;) the statute attempts to confer upon the state board unconstitutional powers; the authority of the state board is fixed by the constitution.

1.  To fix the valuation of live stock.

2.  To assess railroads and common carriers.

3.  To equalize properties in counties for the state revenue.

Three noteworthy limitations are thus expressed or implied, to-wit: limitation of time for valuing live stock; the exclusion of machine shops, etc., from railroad assessments and the denial of power to equalize valuations for other than state revenue purposes. The board's power cannot be enlarged by statute, (8 Cyc. 763; People v. Ames, 60 Pac. 340; Peoples v. Pitcher, supra;) the words (and such other duties as may be prescribed by law,) found in the constitution do not enlarge the power, but are to be understood as referring to things of the same kind, enumerated in the section. (Sutherland St. Con. 268, People v. Dolan, 5 Wyo. 245; St. v. Clay, 3 Wyo. 393; Baker v. Comm., 9 Wyo. 51; Rasmusson v. Baker, 7 Wyo. 117.) Implied powers and restraints found in a constitution are a very important part of it. (8 Cyc. 729, People v. Albertson, 55 N. Y. 50, 55; St. v. Kohnke, La. 335, 793, 804, *et seq.;* St. v. Moores, Nebr. 76 N. W. 175; Brown v. Lakeland, Fla. 54 So. 716; Hopper v. Britt, N. Y. 96 N. E. 371; Lexington v. Thompson, Ky. 68 S. W. 477.) The Colorado cases cited by defendants below do not establish a stable rule on the subject of the powers of State Boards of Equalization. A review of the Colorado decisions, as cited below, will confirm this statement. The reasons urged for the reversal of the judgment are that the raise in value was attempted after authority to do so, had expired; the arbitrary classification of property, and the application of an increase to an arbitrary class defeated the principle of uniformity. The statute under which the board attempted to act, is not in harmony with the revenue system of the state, that has been followed since the organization of our territorial government, and thereafter during statehood.

*W. L. Walls,* Attorney General, and *W. E. Mullen,* for defendants in error.

The period prescribed for equalizations by the state board, under 2810 C. S., is a part of the assessment period; the contention that the county board is, after its July meeting, powerless to carry out orders made by the state board, increasing or decreasing valuations is a mere absurdity; the state board cannot perform its duties in equalizing valuations between counties until assessment returns have been sent in; the clause found in Art. 16, Sec. 10, of the constitution authorizing the state board to equalize valuations in the several counties for the state revenue, and to perform such other duties as may be prescribed by law, imports no limitation of power of the kind contended for; the legislature may confer all powers upon the state board, not denied by the constitution; the state board is not required to give notice to individual taxpayers of its orders increasing or decreasing property in the aggregate, or of a class. (People v. Pitcher (Colo.) 138 Pac. 509; People v. Pitcher, (Colo.) 156 Pac. 812; St. v. Metallic Inv. Co., (Colo.) 138 Pac. 1010; Metallic Inv. Co. v. Brd., (U. S.) 60 L. Ed. 372; Hubbard v. Windsor, 15 Mich. 146; Lee v. Mehew, 8 Okla. 136; Cooley on Taxation, (3rd Edition) 785.) The classification of lands for taxation as prescribed by the state board is not in conflict with 2769 C. S., since it was shown by the evidence that lands of a class are not valued alike, but valued with regard to quality, locality, etc., as required by statute. This meets the requirement of true value, as well as uniform taxation. The increase here involved, was not an increase of individual assessments and did not require notice to individual property owners. The cases cited by plaintiff in error on this point relate to statutes different from ours, and the North Dakota case of St. v. Leech turned upon an assessment grossly excessive, and not upon a question of notice; no contention is made by plaintiffs in error, that their lands were assessed at a valuation in excess of their actual value;

the discussion appearing in plaintiff's brief on the subject
of rules, and the necessity of the state board performing its
duties under rules of its own creation, is without merit; the
record shows that the state board performed its duty as pre-
scribed by statute, and there is no contention to the con-
trary, the validity of the statute, (2810 C. S.) is assailed as
being in conflict with the constitution; that the power dele-
gated by Art. 16, Sec. 10, to equalize property for the state
revenue, is an implied restriction upon the legislature, in
the enactment of laws for the equalization of property for
purposes other than state revenue; state revenue might in-
clude all forms of revenue collected by authority of the
state; the constitution requires uniformity of taxation; such
uniformity could not be accomplished by different stand-
ards of valuation, that is, one for state taxation, and an-
other for local taxation; Art. 16, Sec. 10, of the constitu-
tion requires the state board to assess live stock, railroads
and other properties and its assessments thus made apply
to taxes collected for every purpose; moreover, the section
of the constitution referred to does not restrict the legis-
lature in prescribing duties for the State Board of Equal-
ization.   This action was brought for injunction under Sec-
tion 6302 C. S., it was adopted from Ohio with a settled
construction that it could be invoked only where taxes had
been assessed and levied without legal authority.   (Stevens
v. Daniel, 27 O. St. 527; Groesbeck v. Cinti., 51 O. St. 365;
R. R. v. Wagner, 43 O. St. 75;) a mere over assessment is
not a ground for injunction, (Horton v. Driscoll, 13 Wyo.
66;) at least in the absence of fraud, (Ricketts v. Crewdson,
15 Wyo. 284; Crewdson v. Nefsy, 14 Wyo. 61.)   Courts will
not review proceedings of taxing officers or other official
acts performed within their discretionary powers in the ab-
sence of fraud, (Ricketts v. Crewdson, supra; Brd. v. Bul-
lard, 16 L. R. A. (N. S.) 807, 94 Pac. 129.)   The questions
here involved have been litigated in the state of Colorado
under constitutional and statutory provisions similar to our

own, and the several decisions of the Supreme Court of that state are respectively submitted in support of the position of defendants in error, here. (St. v. Brd., 186 Pac. 699; People v. Pitcher, 138 Pac. 509; St. Brd. v. Metallic Co., 138 Pac. 1010; People v. Pitcher, 156 Pac. 812; Metallic Co. v. Brd., 239 U. S. 444, 60 L. Ed. 372; Buck v. Patterson, 176 Pac. 501,) decisions of the State Board of Equalization are *quasi*-judicial, and not subject to collateral attack. (St. v. Bank, (Mo.) 213 S. W. 815; Union Co. v. Campbell, 48 La. Ann. 1350; New York v. Davenport, 92 N. Y. 604; Brown v. Oneida Co. 103 Wis. 149; Cooley on Taxation (3rd ed.) 785.) The state board may adopt a standard, and equalize valuations to conform thereto. (37 Cyc. 277. Terr. v. Co., 9 Ariz. 405, 84 Pac. 519; Brd. v. Taylor (Miss.) 83 So. 810; Fullar v. Brd., 185 N. W. 157.)

BLUME, Justice.

This is a suit to enjoin the collection of taxes. The plaintiffs in error, plaintiffs below, brought this action on behalf of themselves and other tax payers similarly situated. The petition described the lands of the three plaintiffs, without, however, mentioning into what classification such lands had then been placed for the purpose of assessment for taxation. It is alleged that said property was placed upon the assessment rolls of Platte County by the assessor in the year 1921; that the county board of equalization held its meetings in the months of June and July of that year without making any changes in the valuation of the said lands; that said board finally adjourned on July 27th, 1921, whereupon the assessments of said property for the year 1921 became fixed and determined at the valuation placed thereon by the assessor, and the assessment roll of said county became complete at that time; that thereafter on September 15th, 1921, pursuant to a telegram from the secretary of the State Board of Equalization, dated September 3rd, 1921, the

board of county commissioners of said county directed the county assessor to increase the valuations of lands in said county as follows: Number 1 lands, 75 per cent; Number 3 lands, 20 per cent; Number 5 lands, 75 per cent; that on September 15th, 1921, said county commissioners fixed and determined the levies of taxes upon the properties in said county; that thereafter, pursuant to the direction of said county board of commissioners, said county assessor proceeded and is now proceeding to add to the respective valuations of the three plaintiffs certain amounts specified, and to compute and extend the levies of taxes against the valuations of the lands of said plaintiffs as so increased; that said increases were made without notice to said plaintiffs. Complainants admit the validity of part of the taxes levied against their lands, which they allege to have tendered and offered to pay, and now tender and offer to pay.

An answer was filed, alleging among other things the fact that the increases mentioned were made pursuant to an order of the State Board of Equalization, notification thereof to the county board of equalization of Platte county, and direction by the latter board to the county assessor to make the proper increases. The case was tried, and it appeared in the evidence among other things that by the order made by the State Board of Equalization, number 1 and number 3 lands were increased as stated in the petition; that an increase of 75 per cent was also made of number four lands in said county, said number four lands embracing all grazing lands, as classified by said board, but that the county board was notified that number 5 lands, being second class grazing land as classified by the assessor of Platte county, were raised the per centage mentioned. Other facts will be mentioned later in the opinion. Upon the conclusion of the trial, the lower court found for the defendants, and entered a judgment dismissing the action of plaintiffs. A motion for a new trial was filed, which was overruled, and plaintiffs are here on proceedings in error, in substance alleging as

error that the decision and findings of the court are contrary to law.

1.   The State Board of Equalization in this case ordered the increase in valuation mentioned in the statement of facts on September 3rd, 1921, and pursuant to this order the county board of equalization or of commissioners, on September 15, 1921, directed the county assessor to carry out the order and make the necessary changes in his books.   It is the contention of plaintiffs in error that this was done too late; that at that time no power existed to make such increase.   It is claimed that the assessment period ends for all purposes with the adjournment of the county board of equalization in July and that no power exists to make any changes thereafter except only as to omitted property, and further, that the State Board of Equalization may thereafter equalize the aggregate valuation of all the property in the county as to the state tax only, but that its power extends no further.   It seems also to be contended that even for that purpose the dates above mentioned were too late.   Under the laws of this state the county assessor is required to begin his work on the first Monday of February of each year and complete the assessment roll before the fourth Monday in June.   (Sec. 1515, Wyo. C. S. 1920.)   Valuations of live stock and mineral products are fixed by the State Board of Equalization and certified at least ten days before the day fixed for beginning assessments.   (Const., Art. 15, Sec. 10, and Sec. 2908 of the statutes.)   The county board of equalization is required to hold two regular meetings each year, the first commencing on the first Monday of June, not exceeding 22 days, the second commencing on the fourth Monday in July, not exceeding six days.   (C. S. 2792.)   At the former meeting, the board reviews and hears complaints as to the work of the assessor, adds omitted property and may increase, diminish or otherwise alter or correct any assessment or valuation.   (C. S. 2793.)   In the case of an increase, the tax payer must be notified and he may appear and enter his protest at the July meeting of the board, at

which time the board takes final action on such valuation. (C. S. 2794-2798.) Immediately after the assessment roll is corrected, the county clerk transmits to the state auditor an abstract of the assessment. (C. S. 2776.) The provision that the roll is to be sent to the state auditor has been an incongruity under our law, after the state auditor ceased to be, in 1919, a member of the State Board of Equalization. This incongruity has been corrected by the Session Laws of 1923, Chapter 70. The point, however, is not very material. In any event the assessment rolls sent from the various counties in the state are to be examined by the state board, and it must equalize the valuations.

''so that all the taxable property in the state shall be assessed at its true and full value, and to that end may add to or deduct from the aggregate valuation of the property, or of any class or classes of property, in any county or counties or in any district or subdivision thereof, such per cent as will bring the same to its true value and place its assessed valuation upon a par with property of the same class throughout the state. When such assessed valuation has been raised or lowered, the board shall give notice of the action taken, to the board of equalization of the county in which such property is situated, and upon receipt of such notice by such county board of equalization, the said county board of equalization shall take the necessary action to make effective the· action taken by the State Board of Equalization.'' (C. S. 2810.)

No time is fixed as to when the State Board of Equalization must act as aforesaid. It must fix the valuations of the property of public utilities and certify its action to the various counties on or before the fourth Monday of August, or as soon thereafter as the said board shall have determined said valuation. (Sec. 2813.) The taxes are directed to be levied by the board of county commissioners on the first Monday of September of each year ''and the same may be levied any time prior to the first Monday of September if the statement and notice required by Section 2776 has been

received from the auditor." (Sec. 2787.) The quoted part of the section is unintelligible in the arrangement of sections as found in the compiled statutes. Sec. 2776 refers to the assessment roll to be sent to the auditor; it refers to nothing to be sent *by* him. The error arose out of the wrong transposition of sections in the revision of 1899. Section 2787 of the statutes of 1920 was Section 3806 of the Revised Statutes of 1887 and referred to Section 3805 of the same revision, which provided that the auditor should, immediately after the meeting of the State Board of Equalization on the second Monday in August in each year, transmit to the county clerks of the various counties a report showing, among other things, the equalization made by the State Board of Equalization. This had been the law since 1869, and clearly, therefore, indicated that the levy of taxes should be made upon property as and after it was equalized by the State Board of Equalization. Section 3805 of the revision of 1887 was carried over as Section 1793 of the Revised Statutes of 1899, as Section 2357 of the Compiled Statutes of 1910, and the section is supplanted, as to notice of equalization, by Section 11 of Chapter 135 of the Session Laws of 1919, now Section 2810 of the C. S. 1920. The assessor is required to deliver the assessment roll to the county treasurer by the third Monday of September of each year (Sec. 2788, W. C. S. 1920,) at which time the taxes for the year became due and payable. Taxes become delinquent after December 31st. (Sec. 2855.)

There is no doubt, of course, that the legislature in providing for these various steps to be taken, intended to provide for an orderly,methodical procedure for the purpose of assessment and taxation, and that, generally speaking, it deemed the time up to the first Monday of September of each year as sufficient for the purpose of completion of the assessment, including equalization. Whether or not, however, the dates specified are each mandatory is another question. The correction of the assessment by the county board of equalization is not and cannot finally be made until after its

July meeting, for at that meeting it is authorized to "adjust" any previous increase ordered, and such adjustment is clearly a process in the "correction" of the assessment roll. That roll is to be sent to the State Board of Equalization. It is not reasonable to presume that the legislature meant the state board to act on an incomplete roll. If the contention of counsel for plaintiff in error were correct, that the assessment roll should be sent immediately after the first meeting of the county board, then this board, if so disposed, might at its June meeting make great increases in valuations, annul them at the July meeting, thus deceive the state board in its action, and nullify the constitutional provision for uniformity in taxation. We cannot consent to give such an interpretation to our law. In the revision of 1887 the matter is perfectly clear. There the provision for sending the assessment roll follows the provision for final adjustments made by the county board of equalization. (Secs. 3802, 3803, Rev. St. 1887.) We have no doubt, as already stated, that under the law in force prior to 1919, it was clearly the intention of the legislature that the tax levy should not be made till the State Board of Equalization had acted. Previous to 1919 that board had authority only to add to or deduct from the aggregate valuation of real property in the various counties, but that fact does not alter the principle that the assessment rolls in the state were not considered complete till the equalization had been made by the state board. The same interpretation must be given to the present law. The State Board of Equalization is by law directed to examine the assessment rolls, equalize the valuation of property, and certify its action to the various county boards of equalization. The latter are directed to carry out the equalization as made by the state board. Nothing, we think, could more clearly prove that the action of the latter board is deemed to be one of the integral steps in the system of assessment, and that the roll is not deemed to be complete or final until it has been acted upon by that board. Such is the holding of other courts under similar statutes. (People

v. Board, 290 Ill. 467, 125 N. E. 274; State v. Cudahy Pack.
Co., 103 Minn. 419, 115 N. W. 645, 1039; Hocker v. Howe,
72 Neb. 385, 101 N. W. 255; State v. Wheatley, 113 Miss.
555, 74 So. 427; Taylor v. State (Miss.) 83 So. 810; State ex
rel. v. State Tax Com. (Mo.) 243 S. W. 887.)

The law fixes no time when the State Board of Equaliza-
tion shall begin or complete its work in examining the re-
turns made, and hence there is no ''statutory period for
completing assessments,'' to which counsel for plaintiffs in
error refer, unless from other provisions of the statutes an
absolute time limit is mandatorily set. Sec. 2813 directs the
state board to certify valuations of property of public utili-
ties on or before the fourth Monday of August, or ''as soon
thereafter'' as the board finishes its work in connection
therewith, indicating clearly that the fourth Monday in
August is not the limit of the ''statutory'' assessment pe-
riod. The tax levy, it is true, is to be made on the first Mon-
day in September, if not sooner made, and the assessment
roll is to be turned over to the county treasurer by the third
Monday in September. If these dates were mandatory,
then, no doubt, the assessment period would have an abso-
lute limit. The authorities are in conflict as to whether the
date set for the levy of taxes is mandatory or directory. 37
Cyc. 975, Cooley on Taxation, 487, lays down this rule:

''So in general the fixing of an exact time for the doing
of an act is only directory where it is not fixed for the pur-
pose of giving the party a hearing, or for any other pur-
pose important to him.''

Many illustrations, including cases dealing with the time
of making a levy, are cited. In the case of Prairie Oil &
Gas Co. v. Cruce, 45 Okl. 774, 147 Pac. 152, the court said:

''The foregoing presents the general scheme of taxation
in this state, whereby revenues of the state and of its var-
ious municipal subdivisions are levied and collected. The
various provisions of the statute fix the time at which each
of the several duties shall be performed by the different
officers in the assessment of property and levy of taxes, but

we do not think that these provisions constitute a limitation upon the powers of the officials so as to render invalid any acts performed by them after the time so fixed. There is no doubt that these provisions were intended to put into force an orderly and systematic procedure governing the conduct of the various officers whose duties it is to see to the assessment of the property and collection of the revenues of the state; and it seems clear that these provisions are not mandatory, but are merely directory."

In the case of Tallon v. Mining Company, 59 Colo. 316, 149 Pac. 108, the court said:

"Whether statutes involving the constructive steps incident to taxation are mandatory or directory depend upon whether or not the directions given the officers are for the benefit of the taxpayer to give him notice and opportunity for a hearing, or for any other purposes important to him. The time for fixing the levy and delivering the tax warrant to the treasury are not for the purpose of giving the tax payer notice or a hearing, and are of no concern or importance to him, so far as the time for doing the acts are concerned. Unquestionably it is the duty of the board to make the levy so that the assessor can certify the tax list and warrant to the treasurer on or before the first of January, but the failure of the commissioners or the assessor to do either within the time specified in no manner affects the tax payer and is directory."

In Willard v. Pike, 59 Vt. 202, 210, quoting from Torrey v. Mulberry, 21 Pick 64, it is said:

"Some of the regulations relating to the assessment of taxes are conditions precedent to the legality of the tax, and others are directory merely; that these measures, which are intended for the security of the citizen, or insuring an equality of taxation and to enable anyone to know with reasonable certainty for what polls and for what real and personal estate he is taxed and for what those who are liable with him are taxed are conditions precedent. * * * But many regulations are made by statute designed for the in-

formation of assessors and officers, and intended to promote method, system and uniformity in the modes of proceeding, the compliance or non-compliance with which does in no way effect the rights of tax paying citizens. They may be considered directory.''

In State v. Zillman, 121 Wis. 472, 277, the court said:

''To hold that assessing officers and members of boards of review shall be held strictly to the time specified for the performance of their duties under the statute would result, practically, in a failure to administer the law for the assessment of taxes, under the varying difficulties and obstacles inhering to such a course. These provisions of the statute pertaining to the assessment of taxes must have been intended by the legislature as directory in their execution, and a departure from the letter should not invalidate the action of such officers, unless it be shown that the rights of persons interested were thereby materially affected to their prejudice.''

To the same effect see Buswell v. Board, 116 Cal. 351, 48 Pac. 226; Colorado & S. Ry. Co. v. Board, (Colo.) 196 Pac. 331; Bush v. District, 103 Kans. 876, 176 Pac. 653; Rural High School District v. Raub, 103 Kan. 757, 176 Pac. 110; Birmingham B. & L. Ass. v. The State, 120 Ala. 403, 409.

We think that under these authorities we should construe the provisions above mentioned as directory merely. And the question, therefore, arises, as to when, if ever, an assessment period is completed. We need not definitely decide the question. The State Board of Equalization should act promptly, with dispatch consistent with care, and complete its work within a reasonable time. If the levy is made and the assessment roll delivered to the county treasurer within a period so as to give the tax payer a reasonable opportunity to pay his taxes before they become delinquent, we do not believe that we could say that his interests are materially affected to his prejudice. This is in line with the holding in State v. Doster-Worthington Drug Co., 196 Ala. 447, 71 So.

427, the only case which we have found in point under a statute not fixing the time when the State Board of Equalization should act. (See also State v. Haugen, 168 Wis. 253, 169 N. W. 555; Knaus v. Rolloff (Wis.) 190 N. W. 463.) It does not appear that the plaintiffs in error were deprived of the opportunity above mentioned, and their exceptions on the point under discussion must, accordingly, be overruled.

2.   The State Board of Equalization by its order sent to the county board raised numbers 1, 2 and 5 lands. It is explained in the testimony that No. 5 lands as kept by the county assessor of Platte County are in fact part of the No. 4 lands of the state board. The lands are grazing lands, and no uncertainty existed as a matter of fact as to what particular lands were intended to be increased in valuation. It is the contention of plaintiffs in error that no authority exists in law for the State Board of Equalization to make any classification of property, and that the only *classes* of property which the board may increase or decrease in valuation are those specified by Sections 2757, 2775 and 2776 of the Wyo. C. S. 1920, and we are cited to Bell v. Meeker, 39 Ind. App. 224, 78 N. E. 641; Gray v. Foster, 46 Ind. App. 149, 92 N. E. 711; Smith v. Kelly, 24 Or. 464, 33 Pac. 642; Oregon etc. R. Co. v. Croison, 22 Or. 393, 30 Pac. 219; Campbell v. Minnehaha Nat. Bank, 11 S. D. 133, 70 N. W. 10 and a few other cases directly or impliedly holding that the State Board of Equalization cannot classify property without statutory authority. We may grant the premises to be, ordinarily, correct. Boards of equalization are, in the absence of constitutional provisions, creatures of the statute and cannot exceed the authority granted them. Before proceeding further, however, we might discuss the advisibility of classification in general in order to understand the legislation on the subject. Anyone at all familiar with the varied classes of lands within the state should, it would seem, realize how impossible it would be to attempt any effective equalization of valuation of lands within the state, without recognizing the distinctive features which

nature has indelibly imprinted upon them. We think, in common with the Supreme Court of Oklahoma, as expressed in the case of In Re Appeal of McNeal, 35 Okla. 17, 35, that the system which enables the State Board of Equalization to distinguish between classes of property is an advanced step over the system which previously existed. The Supreme Court of Oklahoma, illustrating this subject, said:

"If the contentions of counsel were to be sustained, it would be necessary, in order to impose a just proportion of the burden of taxation upon the owners of town lots by increasing them to their fair cash value, to, at the same time, increase the valuation of farm lands 50 per cent above their fair cash value. It can be seen at a glance that a system which would require this would be an iniquity, which should not be permitted to continue. So it is with the equalization between classes of personal property.   *   *   *   As we view it, the legislature of this state sought to correct just the evils which existed in the old system, and under the scheme here worked out there has been brought about a better and a more uniform assessment and more equitable distribution of the burdens of taxation among the people who must bear them.   *   *   *   The system which enables a State Board of Equalization to distinguish between classes of property, some of which have been assessed too high, and others of which have been assessed too low, and bring them all to a common standard, is an advanced step over the system which previously existed in this jurisdiction, and which exists in a number of states. That it has not and will not make mistakes is not assumed nor claimed; no one expects this; but that its errors will be less in degree and number than they would be if it lacked this power every one must concede."

And the Supreme Court of New Mexico said in Ranch & Cattle Co. v. Board of Equalization, 18 N. M. 531, 543:

"If the valuations in counties can only be increased or decreased as a whole, then the state board has no power to adhere to the fundamental principle of taxation prescribed

in the act, namely that the basis of valuation shall be actual value. If a given class of property in a county is correctly valued, and another given class in the same county is undervalued, and the state board decreases the total valuation in that county, it necessarily departs from the correct standard of valuation as to the first-named class of property. If it increases the valuation of the county as a whole, it necessarily imposes an unjust burden upon the owners of the class of property which had theretofore been properly valued.''

These principles so announced may be illustrated in the case at bar. Class two, uncultivated irrigated lands, were not affected by the order of increase in valuation, because that land had, in the judgment of the board, already been assessed at its full value. If the board had been compelled to raise all of the property in the county, it is clear that the owners of second class lands would have suffered an injustice. The fact that lands comprised within certain classes are, because of distance from market and other factors affecting value, not assessed at a uniform valuation, does not militate against what we have said. Absolute justice cannot be attained; we can strive only for an approximation thereto, and we think that injustice may be reduced under the system of equalizing classes to a greater extent than under a system not permitting that to be done.

If it is true, and we believe it is, that the system enabling the equalization by classes is designed for and adapted to the purpose of furthering a just and equal distribution of the burdens of taxation, then legislation tending in that direction should be liberally, rather than strictly, construed. (State v. Haugen, 168 Wis. 253, 169 N. W. 555.) Counsel for plaintiffs in error argue, as before stated, that the board cannot equalize the valuations of classes of property other than those specified in the statutes. Section 2757 prescribes what property is assessable. It enumerates a number of classes of personal property, but mentions real estate simply as lands in general and town lots. That is true

also in Sections 2775, providing for the items to be entered on the assessment roll, and in Section 2776, providing for the assessment roll to be sent to the state auditor. None of the sections agree in designating the different kinds of property. In fact, so far as we are able to observe, no purpose is manifest therein that a definite, fixed classification even of personal property was intended to be made therein. If that is true as to personal property, it would seem to be equally true as to real property. Sec. 2776 contains the specific provision that the board of county commissioners is authorized to diminish or add to the list mentioned therein, and "to require such different, or further matters to be returned as it deems advisable." There can be no question that under this provision the board of county commissioners may require lands to be divided into the identical classes adopted by the State Board of Equalization, and this seems unmistakably to point to the fact that the kinds of property actually enumerated in the statute were not intended to represent a fixed, definite and unalterable classification of the legislature. Under Section 11, Chapter 135 of the Session Laws of 1919, now Section 2810 of the statutes of 1920, the State Board of Equalization is given power, as already seen, to "add to or deduct from the aggregate valuation of the property, or of any class or classes of property." By the same section it is given power to "make all necessary rules and regulations for the performance of its duties," and since one of its duties is to add to or deduct from the valuation of any class, it would seem that the power to make rules and regulations includes the power to make classes. In any event, there is nothing in the act of 1919 in any way limiting the board to the classes mentioned in previous statutes. A grant of lawful power ordinarily implies and carries with it incidental authority to use all necessary means to perform it, (31 Cyc. 1344,) unless the contrary should appear. And while, perhaps, it is true, as a general rule, as said in Com. v. P. Lorillard Co., 129 Va. 74, 81, that it is the duty of the legislature to pass such laws as are neces-

sary to carry into effect its provisions relating to taxation, still it would seem that when provision is made for the State Board of Equalization to equalize valuations of property by classes, no serious objection exists why the principles above mentioned, that the board should have the right to adopt the means to carry out the main power, should not apply. In the case of In Re Appeal of McNeal, supra, a case strikingly similar to this case on the point under consideration, it appears that the duty of the State Board of Equalization included the power to increase or decrease "the aggregate assessed value of the property or any class thereof," and it was held that the board had authority under this provision to divide the property of the state, real and personal, into different classes for the purposes of taxation. In the case of Salt Lake City v. Armstrong, 15 Utah, 472, 49 Pac. 641, the power to equalize the valuation of real and personal property without prescribing any definite method, was held to leave the board the discretion to adopt any reasonable means to carry out the authority granted. The case of Copper Queen Cons. Min. Co. v. Territorial Board, 206 U. S. 474, 27 Sup. Ct. 695 is to a similar effect. In the case of Ranch & Cattle Co.v. Board, 18 N. M. 531, 543, 131 Pac. 159, the court said:

"Another consideration is the fact that the precise manner of the exercise of the power of equalization by the state board is not pointed out in the statute. It is therefore fair to assume the legislative intent to have been to confer upon the board an efficient power of equalization so that the burdens of taxation may be equally distributed throughout the state, and upon all of her citizens. An efficient power of equalization cannot be exercised by the state board unless it has power to deal with classes of property, because the valuations are based upon classification. Justice cannot be done by the state board, by way of equalization, as between citizens of the state, unless it has the power to equalize valuations of classes of property, both of different kinds in the same county and of different classes as between counties

throughout the state. It would seem clear, therefore, that unless the power of the state board is lacking or restrained by reason of the terms of the legislation, considered as a whole, the state board ought to have, and has, the power to deal with classes of property, both within any given county and between counties throughout the state. To hold otherwise is to defeat the express intent of the taxing laws.''

We may go a step further. We held in the case of Bunten et al. v. Rock Springs Association, decided this day, that the court will take judicial notice of the published reports of the tax commissioner and of the State Board of Equalization in so far at least as they illustrate the general history of this state. The first report of the tax commissioner of this state relating to the years 1909 and 1910, and laid before the legislature of 1911, contains the following:

''Believing that there should be a uniform classification of lands among the counties of the state, at a meeting of the county assessors, held in the Capitol Building on November 15, 16 and 17, 1909, this was discussed and the assessors arranged and adopted unanimously the following classification: Class 1—Irrigated lands, cultivated. Class 2—Irrigated lands, uncultivated. Class 3—Dry farming lands. Class 4—Grazing lands. Class 5—Coal lands. Class 6— Timber lands. Class 7—Mineral lands.''

A tabulated statement as to the acreage and valuation of the various classes of lands in each county is appended. A like tabulation is contained in every biennial report of the tax commissioner to the year 1919 and of the State Board of Equalization since 1919. Up to and including 1919 five sessions of the legislature of this state had before it the biennial report relating to the two years immediately preceding each session, and it is not reasonable to hold that under these facts the legislature of 1919, which created the State Board of Equalization and authorized said board to equalize property by classes, meant to exclude the classes uniformly used in the state for ten years. We think that the legislature knew the history of this state, adopted the Act of

1919 in the light thereof, clearly recognized the classifica-
tions as previously made, gave power to the state board to
continue these classes and to make any reasonable amend-
ments thereto. In the case of Dayton v. Board, 33 Or. 131,
50 Pac. 1009, 1014, the court said:

"The mode or manner in which the board shall equalize
personal property is prescribed by the act, which is that it
shall add to or deduct from the aggregate valuation of the
several kinds or classes thereof so as to make them conform
to their true cash value.  *  *  *  This is a legislative
recognition that there exist different kinds and classes of
that species of property, but no where is there any attempt,
that we know of, to specify the classifications, nor to indicate
what kind of property shall be comprised in each.   This
matter was probably intended to be regulated by the form
of assessment rolls prepared and sent out to the several
county clerks and by them distributed to the assessors.
*  *  *  The blank rolls are certainly intended as a direc-
tion to the county officials, and should be followed, as it
tends to produce uniformity in classifications, which is es-
sential to equality in assessment and taxation."

Under the power to make rules and regulations for the
performance of its duties, we think the State Board of
Equalization in this state has ample power to require that
the returns which it is required to examine shall contain a
showing of the various classes of lands by it adopted, so as
to enable it to carry out the authority granted to it by law
to equalize property in the state by classes.   The classifica-
tion should not, on the one hand, be so minute as to evade the
statutory requirement that notice must be given the tax
payer when a change is made in his, her or its individual
assessment, and on the other hand, two or more classes of
property, having no relation to each other, should not be
confused, so as to work an injustice on the tax payers.   We
cannot, at this time in any event, lay down any general rule,
except to say that whatever classification is made must be

reasonable, and must be adapted to the purpose of effectuating uniformity in taxation.

3.   The order of the State Board of Equalization, made as above mentioned, raising the valuation of lands, was addressed to the county board of equalization of Platte County.   The board of commissioners of that county met on September 15th, 1921, to make the tax levy, and while in session, the notice from the state board was laid before it. Without apparently resolving itself into a board of equalization, which, technically should have been done, the board directed the county assessor to carry out the order received. We held in the case of Bunten, et al. v. Rock Springs Grazing Association, supra, that where the increase in valuation is legally ordered by the state board, the execution of that order is ministerial; that when the increased valuation is extended on the assessment roll by the county assessor, the resulting tax will not be enjoined, even though no order whatever had been given by the county board of equalization to the assessor to make the increase directed by the state board, and that the lack of such order constitutes an irregularity merely.   The membership of the board of county commissioners and that of the county board of equalization is the same.   The members were, in this case, duly assembled, and thus gave the order to the assessor above mentioned.   We think that whatever error was committed was an irregularity merely and is no ground for an action in injunction against the tax herein.

4.   Much evidence was introduced in the case at bar as to the diversity of classifications of real property in the state. The assessment schedules, used by the assessors in the various counties in the state, seem not to have been uniform.   In a number of counties, as Campbell, Johnson, Natrona, Park and perhaps other counties, the classification set out in the reports of the tax commissioner and State Board of Equalization seem to have been employed.   In Laramie county the second class land, instead of being described as uncultivated and irrigated, seems to have been described as irrigated

meadow land, but, as shown by the testimony, was, nevertheless, treated by the State Board of Equalization as uncultivated irrigated land, and while this may not, perhaps, in some cases be strictly true, we cannot say that in the approximation toward justice in matters of taxation, which is the best we can hope, it is far from right. In Albany County the third class land seems to have been described as irrigated grazing land, the fourth class as common grazing land —something similar to the classification in Platte County. As explained by the testimony, the state board treated these classes under the head of grazing lands. We are not able to say that this was wrong, at least to an extent so as to justify the court to interfere. We cannot take the time or space to analyze other classifications used in other counties. The State Board of Equalization is directed by law to familiarize itself with the conditions and values in the state. It receives returns upon a uniform blank sent out by it, and we cannot assume, in the absence of evidence, as in this case that the local officers, familiar with the classes of lands in their own county, will insert or report lands under the various classes mentioned in the blank which do not belong there, or that if the form sent out by the State Board of Equalization is not strictly complied with, but alterations or additions are made, that the state board would not be in position to put and treat the property reported under one of the classes adopted by it. Greater uniformity in classification is no doubt desirable, and will doubtless be obtained in pursuance of the broader power given to the State Board of Equalization under Chapter 56 of the Session Laws of 1923 "to prescribe forms for uniform schedules, rolls and other documents and to determine how lands should be classified for assessment purposes."

In the case at bar the assessor of Platte County reported two classes of grazing lands, indicating them as Numbers 4 and 5. The State Board of Equalization has no such classification. It treats all grazing lands as one class, which is designated as No. 4. By its order it increased No. 4 lands

by 75%, which accordingly meant an increase of both No.
4 and No. 5 lands as reported by the assessor of Platte Coun-
ty. But the state board reported to the county board that
No. 5 lands only had been so increased. The No. 5 lands
mentioned presumably are grazing lands of the second class.
The grazing lands of the first class were reported in the re-
turns at an average valuation of $4.01, the second class at
an average valuation of $2.585 per acre. The state board,
by increasing the latter to the extent of 75%, brought it to
$4.51 per acre. There is some evidence in the record in-
dicating that the value of second class grazing land is not
as great as that of the first class grazing lands, and we must
confess our inability to see the reasons for the action of the
state board in increasing the valuation of second class graz-
ing lands to the extent of 75%. Apparently a plain injus-
tice was committed by the board by this action. The board
in doing so violated its own order. It caused only part of
the grazing lands to be increased, contrary not only to its
rule of treating all grazing lands as one class, but also con-
trary to the express motion adopted, that No. 4 lands, that
is to say, all grazing land in Platte County, should be in-
creased in valuation. In a proper case, timely brought, the
tax resulting from such illegal action could doubtless be en-
joined to the extent of the injustice done, but we do not see
how the plaintiffs can complain, since they do not appear to
be owners of grazing lands. The decisions are, perhaps, not
quite uniform as to when one tax payer may complain on be-
half of others, but we have found no case holding that this
can be done under circumstances which we are now discuss-
ing. In Morris v. Cummings, 91 Tex. 618, 45 S. W. 383;
Carlton v. Newman, 77 Me. 408, 1 Atl. 194, and other cases,
it is held that a tax illegal as to all can be enjoined by one
tax payer suing in behalf of all. In Stiles v. City of Guth-
rie, 3 Okl. 26, 41 Pac. 383, it was held that several persons
whose property is affected in the same manner by the same
illegal tax may join in an action to restrain the collection of
the tax as to them, but that in such action the court cannot

enjoin the collection as to persons not parties to the action, the court saying in part:

"So, too, in this case, the question of common or general interest in many persons, which will entitle one or more persons to sue on behalf of all when the parties are numerous, must be in the subject matter of the action, and not in the question as an abstract legal proposition, as is the case when applied to property in which the person bringing the action has no personal interest, but is concerned from a' philanthropic impulse, or as the case may be a precedent for his individual litigation. A man who has property sought to be subjected to the payment of an illegal tax is, from a legal standpoint, no more interested in the question as to whether or not property wholly belonging to other persons shall be subjected to the burden of the same illegal tax, than if he had no property affected by such a tax at all."

In the case of Hudson v. Commissioners, 12 Kan. 140, 147, the court said:

"Where a tax is illegal in the abstract—illegal in and of itself—illegal as applied to every owner of taxable property in the county or district, then every person who has property affected by such illegal tax, or so many of them as may choose, may unite in an action to restrain the collection of such tax. Thus where a tax is levied to pay interest on illegal bonds  *   *   *, or to pay illegal street assessments *   *   *,  all persons whose property may be affected by such tax, or so many of them as choose, may unite in an action to enjoin the same; for the tax as a tax is illegal. But when the tax as a tax is valid, as for instance, an ordinary county tax, or state tax, or school tax, but becomes illegal only as applied to particular persons or property, or to particular cases, then each person severally interested must sue alone."

In the case of DuPage County v. Jenks, 65 Ill. 275, the tax was claimed to be illegal because of an illegal assessment, and the case was therefore closely in point. The court in part says:

"In such case what right have other persons not appointed to act for them, who have not been requested or even desired to interpose, to elect themselves their agents to prevent them from discharging not only a moral but a public duty— the duty of paying a fair share of the taxes necessary to support their government. Each individual has, no doubt, the legal right, where a tax has been imposed upon him that he conceives to be illegal, to contest its validity, but we are at a loss to comprehend how he thereby acquires the right to determine that his neighbor shall not pay a tax similarly imposed upon him. Each individual tax is a separate and distinct burthen, and stands wholly disconnected from that of other persons. Complete justice may be done in each several case, and the matter there adjudicated cannot be called in question by others; nor can any claim be interposed in regard to the tax then litigated by other persons not parties to the suits. Hence there can be no necessity to make others parties.—It cannot be held that a litigiously disposed person may, on his own motion, file a bill in his own name and on behalf of all other tax payers of the county, and stop the collection of all the revenue for the support of the state, the county, townships, cities, towns, schools and other municipalities. Our government is not and never can be at the mercy of one or a few individuals, thus to bring it to an end by the forms of law.''

See also Powell v. Durr, 9 Ohio Appeal 237. In the case at bar the plaintiffs do not seem to have any grazing lands; at least there is no evidence in the record that they have. They are not in the slightest degree interested in the question whether grazing lands were increased in valuation legally or illegally; they are not affected thereby, and they are not, accordingly, in position to raise any question relative thereto.

The land of the plaintiff Fish was second class land—land irrigated but uncultivated, but was assessed as first class land. There is some evidence in the record indicating that the discrimination was intentional, arising from an order

made by the county board, carried out by the assessor. It was, in any event, it seems, a plain violation of the rule, or understanding, adopted by the local board itself to put uncultivated irrigated land in class two. The discrimination so resulting was no doubt illegal, and the illegal tax resulting therefrom could doubtless have been enjoined in a proper and timely action. (People v. Railroad Co., 286 Ill. 676, 122 N. E. 109; Peoples Gas, Light & Coke Co. v. Stuckart, 286 Ill. 164, 121 N. E. 629.) We discussed the law of illegal discrimination to some extent in the case of Bunten v. Rock Springs Grazing Association, supra. The injustice above mentioned did not, however, arise by reason of any action of the State Board of Equalization. Nor is any allegation of illegal discrimination made in the petition; that issue was not tried herein, and no relief is asked by reason thereof. Besides, the other plaintiffs are in no way jointly interested therein, and hence that question is not properly before us.

5. It is urged that under the constitution the State Board of Equalization has no power to equalize the valuation of property except for state taxes. The argument that local matters should be left to local officers has force, and should, ordinarily, have considerable weight in determining the question before us. There is perhaps too great a tendency toward centralization of power over the nation generally, and the ancient Anglo Saxon institution of local self-government, the bulwark of the liberty of the people, seems, if this tendency continues, to be on the way of vanishing. But we must, necessarily, be guided by the provisions of our constitution, and these provisions are significant. The State Board of Equalization fixes the value of railroad property, and also that of live stock, which at the time of the adoption of the constitution constituted a considerable per centage of the property in this state. Since that time additional authority to fix values has been conferred on the state board by the legislature. It is empowered to fix the valuation of the property of all coal companies, oil companies and public

utilities in the state, even though such utilities are located and operate in one county only. We assume, without deciding, that this is a delegation of power which was authorized by and within the contemplation of the constitution. It is thus seen that a large portion of the property in this state is valued directly by the State Board of Equalization, and if we should hold that equalization by that board may be made only for state taxes, it might frequently happen that property located in the several counties and assessed by local officers would be undervalued as compared with the property directly valued by the state board and thus have a tendency to lead to a great deal of injustice.

Section 10 of Article XV of the Constitution provides that the duties of the State Board of Equalization shall be to fix the valuation each year (1) of live stock and (2) of the property of common carriers, with certain exceptions. The section then continues:

"Said board shall also have power to equalize the valuation on all property in the several counties for the state revenue and such other duties as may be prescribed by law."

The doctrine of *ejusdem generis* may be applied under the clause that the board shall have "such other duties as may be prescribed by law," to fixing valuations in other cases than those mentioned. The duty to value the property of coal and oil companies and public utilities has no doubt been imposed—whether properly or not we need not decide —under this clause. But it is difficult to see how the doctrine can, under the clause mentioned, be applied in any manner whatever to *equalization* of property if the power to equalize is limited, as contended, to one thing, namely, to equalize valuations for state revenue. It is not at all clear that, because equalization for the state-tax was specifically mentioned, that the power of equalization for other purposes was intended to be excluded. Prior to the adoption of the constitution, power was vested in the then State Board of Equalization to equalize property valuations for territorial

revenue. (Sec. 3804, Rev. St. 1887.) And the constitutional provision above quoted, granting this specific power to the state board, seems rather to indicate the purpose that this authority should remain, and that the legislature should not have the power to take it away, and the further provision that the board should have "such other duties as may be prescribed by law," seems to leave to the legislature, on the other hand, full right to enact laws authorizing the state board to equalize the valuation of property also for other purposes, for the legislature has plenary power in the matter unless specifically restricted by the constitution. This appears to be the correct view when we come to consider Section 11 of Article XV of the constitution, which reads as follows:

"All property, except as in this constitution otherwise provided, shall be uniformly assessed for taxation, and the legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal."

This section specifically confers plenary power upon the legislature to enact such measures as it deems proper to bring about the just valuation contemplated. There is no limitation here. Whatever method is reasonably adapted to the purpose mentioned may be chosen. It cannot be said that the state as a whole is interested only in assessments for purposes of the state-tax. Its subdivisions are all to more or less extent state agencies to carry out the fundamental purposes of government. Hence the state is interested in the taxes to be raised by its agencies to carry out their functions. Taxation is a governmental power. Without legislative authority no taxes can be raised. And it should, accordingly, not alone be the right of the state, but its duty as well, to protect its citizens as nearly as possible in the constitutional right to have all property uniformly assessed for the purpose of raising revenue necessary not only for the state government itself, but also those necessary for its various agencies. With this end in view assessors and coun-

ty boards of equalization have been created. Up to 1919 the power of the State Board of Equalization was limited to equalizing aggregate valuations of real property. But we well know that we had in this state the same problem which has existed in every other state—unequal assessments, particularly as between the various counties in the state. And it had been recognized for years that a better system should be devised to carry out the constitutional mandate of uniformity. There is no doubt that under Section 11 of Article XV of the constitution, quoted supra, the legislature has the authority to create any board, tribunal or commission with power to equalize, or aid in equalizing, valuations of property for the purpose of raising revenue for county and other local purposes. This, in fact, was part of the duty of the tax commission existing in this state from 1909 to 1919. (Sec. 221, Comp. Stat. 1910.) Instead of creating a separate commission or board, no good reason is apparent why the authority mentioned should not be vested in the board which by the constitution is vested with power to equalize valuations of property for state revenue. With this end in view, and to remedy the existing evils, the legislature in 1919 made provision for the present State Board of Equalization, with its comparatively comprehensive powers, and with all the imperfections of the present system—for none can be found that is perfect—it cannot be denied that this legislation is, at least reasonably well, adapted to carrying out the purpose and intent of Section 11, supra, and hence must be held to have been fully authorized thereby. As upholding generally what we have said see Spalding v. Hill, 9 Ky. Law 852; State v. Power Co., 121 Minn. 421, 428, 141 N. W. 839; Ray v. Armstrong, 140 Ky. 800, 809; 131 S. W. 1039; State v. Wheatly, 113 Miss. 555, 588; State ex rel. Myers, 52 Wis. 628, 630; State Tax. Comm'rs. v. Board of Assessors, 124 Mich. 491, 496; Attorney General v. Board of Supervisors, 178 Mich. 513, 520; Board of Equalization cases, 49 Ark. 518; The People ex rel. v. Solomon, 46 Ill.

-333. In State Tax. Comm'rs. v. Board of Assessors, supra, the court said:

"The state is concerned in the proper assessment of property, not only as to its own interests as they are affected by the collection or failure to collect the funds necessary to carry on government, but, as the supreme authority in the state, the legislature is required by Section 12, Art. 14, of the Constitution, to see to it that assessments be made on property at its real value. We think that the authority of the legislature is not so restricted as to preclude the use of a state board in carrying into effect this important constitutional provision."

And the same court in Atty. General ex rel. v. Board of Supervisors, said:

"Can it be said that the equalizing of assessments between the assessing districts of a county is a matter of purely local concern, and that the state had no interest in the matter? * * * Equalization is an important factor in taxation, and, under our present system, the levy and collection of taxes is incomplete without it. The State Board of Equalization, under the Constitution, equalizes the state tax as between the various counties, and it would seem that the constitutional provision requiring the legislature to provide a uniform rule of taxation is for the purpose of equally distributing, as between taxation districts and individuals, the burden of taxation. In order to do this, it follows as a natural consequence that the legislature is empowered to create the necessary agencies to carry into effect the duty thus imposed."

In the case of Van De Griff v. Haynie, 28 Ark. 270, the court, holding the act creating the State Board of Equalization constitutional, said:

"In reference to taxation, the constitution is not so much to be regarded a grant of power as a restriction or limitation of power. That restriction which requires that all property shall be taxed by a 'uniform rule' is so manifestly just, that it commends itself to universal assent. * * * The duty

of ascertaining taxable values, and of assessing and collecting taxes thereon, necessarily rests in the discretion of the legislature, and it may perform that duty by its own legislative acts, or through the agency of such officers or tribunals, as it may appoint for that purpose.''

And again in Board of Equalization cases, 49 Ark. 518, the court, after referring to the constitutional provision similar to Section 11, supra, and speaking of the valuation made by local officers, said:

''But this valuation need not be final. On the contrary, it becomes the duty of the legislature to afford the means of making the approximate estimate of values conform as nearly as practicable to the constitutional design of equality and uniformity.    *    *    *    When the power to create the board is once established, it would seem to be the duty of the legislature to empower it to equalize the burden of taxation by adjusting the assessments of all property subject to taxation to the common standard of actual values.''

In Sav. & Loan Society v. Austin, 46 Cal. 415, 475, the court, holding the act creating the State Board of Equalization constitutional, said:

''As already stated, the governing rule ordained by the constitution—the central idea which pervades that instrument in respect to taxation—is that it shall be equal and uniform, and that property shall be taxed in proportion to its value. As one of the necessary steps towards ascertaining its value, local assessors must be elected, who shall make the primary valuation. But there is nothing in the instrument to indicate that this valuation was intended to be final. On the contrary, it is expressly provided that the valuation to be ascertained ''as directed by law''—which is an explicit recognition of the power of the legislature to provide appropriate methods for ascertaining the value.''

6. No notice was given to the tax payers by the State Board of Equalization of the increased valuation made in the case at bar, and the statute provides for no such notice where the valuation of all or a class or classes of property in

any county is increased horizontally. Counsel for plaintiffs in error try to distinguish this case, where an increase was made of the valuation of classes of property, from a case where an increase is made in the valuation of the aggregate property in the county, and contend that in this case notice should have been given. We do not believe that the distinction sought to be drawn is well founded. Where the valuation of all of the property in the county is raised, more people might be affected. Here, some 1700 were involved. The fundamental principle is, we believe, the same in both cases, and we shall, accordingly, consider the law applicable to this subject in general in order to determine the rights of the plaintiffs herein. Where the assessments of 1700 people, or a much less number, or a greater number, are increased, without any notice whatever, the question as to whether or not there has been due process of law may well demand the serious attention of a court, and we must confess that its solution has not left us with that full and complete satisfaction which we could wish to have after giving the question abundant and thoughtful consideration. As to what constitutes due process of law in cases of special assessments was considered by us in the case of Bass v. City of Casper, 28 Wyo. 387, 432, and we there held that a person assessed must, ordinarily at least, at some stage of the proceedings have notice thereof and opportunity to be heard as to the validity and the amount of the tax against him. That no doubt is true also, generally, in case of assessments for general taxes. (26 R. C. L. 345; Cooley on Tax. 62, 626.) Still a somewhat more liberal construction seems to obtain in the latter class of cases. In the case of Turpin v. Lemon, 187 U. S. 51, 57, 58; 23 Sup. Ct. 20, 28; 45 L. Ed. 70, it was said:

"Exactly what due process of law requires in the assessment and collection of general taxes has never yet been decided by this court, although we have had frequent occasion to hold that in proceedings for the condemnation of land under the laws of eminent domain, or for the imposition of

special taxes for local improvements, notice to the owner at some stage of the proceedings, as well as opportunity to defend, is essential    *    *    *    But laws for the assessment and collection of general taxes stand upon a somewhat different footing and are construed with the utmost liberality, sometimes even to the extent of holding that no notice whatever is necessary.

To the same effect see Glidden v: Harrington, 189 U. S. 225. See also The C. & E. R. Co. v. Keith, 67 C. S. 279, 292. It is well settled that due process of law in assessments for general taxes does not require that personal notice be given, in order to authorize a board of equalization to increase or decrease an assessment. If the statute specifies the time and place when and where the board shall meet, that is considered sufficient, and treated as the equivalent of a personal notice. All persons interested must take notice that the power of the board to equalize property may be exercised at that time and place, and that his, her or its property may be affected thereby. (37 Cyc. 1099 and cases cited; Cooley, supra, 630.) The rule has frequently been applied to cases where the statute fixed the date and place of meeting of a State Board of Equalization. (Colorado Tax Commission v. Pitcher, 56 Colo. 343, 369, 138 Pac. 509; People v. Pitcher, 61 Colo. 149, 156 Pac. 812; Territory v. First National Bank, 10 N. M. 283, 303, 65 Pac. 172; Pittsburg etc. Ry. Co. v. Backus, 154 U. S. 421, 14 Sup. Ct. 1114; State Railroad Tax Cases, 92 U. S. 575; Kentucky R. R. Tax Cases, 115 U. S. 321, 6 Sup. Ct. 57; Ray v. Armstrong, 140 Ky. 800, 816, 131 S. W. 1039; Lander v. Mercantile Co., 186 U. S. 458, 22 Sup. Ct. 908; Bimetallic Investment Co. v. State Board of Equalization, 239 U. S. 441, 36 Sup. Ct. 141; People v. Orvis, 301 Ill. 350, 133 N. E. 787; cases in note to L. R. A. N. S. 1916 E, p. 8.) We have found no case holding notice necessary in a case like that at bar, where the statute makes no requirement that notice be given. The case of State ex rel. v. Leech, 33 N. D. 513; 157 N. W. 492, to which we have been cited, involves individual and original

assessments of four light and power companies. In New Jersey, Indiana and Louisiana, the statute requires notice. The cases from those states are, therefore, not in point. The statute of Ohio appears to provide for no notice to be given when an increase of a class or classes of property by percentage in valuation is made or proposed. Nor is a definite time fixed by law for the meeting of the state tax commission in order to consider the equalization of property. In Hammond v. Winder, 100 O. S. 433, 126 N. E. 409, the court held that an increase of the valuation of such property by adding thereto a certain percentage, made by the tax commission without any notice, was not violative of due process, because, first, the property in each county is equalized by county boards of equalization, with ample opportunity for each tax payer to appear before such board in order to have the proper adjustment made of his assessment, and second, because the statutes of Ohio permit a tax payer to enjoin an illegal assessment. Substantially the same was held in Oscamp v. Lewis, 103 Fed. 906; State ex rel. v. Jones, Auditor, 51 Ohio St. 492, 516. In the case of McMillan v. Anderson, 95 U. S. 37, the court held that a statute which gives a person against whom taxes are assessed a right to enjoin their collection, and have their validity judicially determined is due process of law, notwithstanding he is required, as in other injunction cases, to give security in advance. It must be noted, however, that in that case the tax was a license tax, the amount of which was determined by the legislature, and did not depend upon the exercise of any discretion or judgment of the assessing officers. It seems that in Ohio, as in this state, an assessment that is alleged to be excessive only cannot be enjoined. (Hagerty v. Huddletson, Hubbard & Co., 60 Ohio St. 149, 165; Wagoner v. Loomis, 37 Ohio St. 571.) Hence the holding in Hammond v. Winder, supra, is exactly in point in this state. It may be that, though no notice is given of an increased assessment, there is no want of due process, for the reason mentioned, in those cases, which involve an illegal assessment. But, without now defi-

nitely deciding the point, we are not at this time prepared to hold that the statute permitting such injunction would be sufficient in all cases; in one, for instance, which involves only the question of an excessive increase of the valuation of property, for in such case, as we held in Bunten v. Rock Springs Grazing Association, supra, the statutory right to an injunction affords no remedy whatever. (See Judson on Tax. Sec. 329.) It would seem that if an increase in valuation, made by the State Board of Equalization in such case without notice, may be said not to be wanting in due process of law, the reason therefor must be grounded in a theory different from that assigned in Hammond v. Winder, supra. Without reference, however, to the theory of that case, we think, construing the laws of this state liberally, (Turpin v. Lemon, supra,) that a horizontal increase in the valuation of a class or classes or all of the property in any county, made under our law by the State Board of Equalization without notice, may be upheld as not violative of due process of law for the following reasons:

(a). The county board of equalization, as we have seen, has two meetings in each year. The tax payers in the respective counties have a right to appear before that board and cause to be made whatever adjustments are necessary. We must presume that thereafter the various owners of classes of property in the county stand on an equal footing, and that as between themselves the valuations of their respective properties have been fully equalized. (Carrico v. Crocker, 38 Okl. 440, 133 Pac. 181; Colorado Tax Commission v. Pitcher, 56 Colo. 343, 370, 138 Pac. 509; Bi-Metallic Inv. Co. v. State Board of Equalization, 239 U. S. 441, 36 Sup. Ct. 141.) But the process of assessment is not yet complete; the valuations are still subject to review by the State Board of Equalization. For that board to give notice to every tax payer in the state whose property might be affected by a horizontal increase in valuation is impracticable. The individual tax payers are interested in uniformity of taxation, and yet, it is plain that they would not

and cannot take upon themselves the burden of looking after that. They have, through the legislature, delegated that duty to the State Board of Equalization, which has been constituted as the agent of the people for that purpose. The proceedings before that board are in no sense adversary. It simply makes adjustments whenever that may be necessary, and acts as the arbitrator between the tax payers, and for that purpose each tax payer is represented by and through the board itself. If it acts illegally, it may be enjoined. But it is presumed that, acting as arbitrators merely, the members will act justly and attempt to oppress no one. Except in cases of individual assessments not now under consideration, they may make increases or decreases only horizontally of the valuation of all the property in the various counties or of a class or classes of property. This generally, affects a large number of people, and the temptation, if any, to commit injustice is reduced to a minimum. The opportunity to get rid of unjust officials exists in any event in the elections. The adjustments should be made, and since notice to a large number is impracticable, the people must trust some one, and rely to some extent upon the inherent honesty of men. Cooley on Taxation, 786, states that no notice need be given in such case unless the statute requires it. In the case of Snydom v. Merrick County, 19 Nebr. 155, 158, dealing with an increase of the aggregate valuation of a precinct, made by a local board, the court said:

"But the increase of the assessment of a precinct is not made upon any one's complaint, but arises in the official mind and judgment of the commissioners, upon an inspection and comparison of the assessment rolls of the several precincts. The law has designated no officer or person upon whom notice could be served or to represent the precinct at such equalization. The county commissioners themselves are the only and proper representatives of the precinct, and as they constitute the board of equalization no notice need be served on them."

· ·In the case of Scammon v. the City of Chicago, 44 Ill. 269, 276, the court said :

·  ''The objection that the property owners had no notice ·of this addition of forty per cent, is answered by the fact that the charter requires but one notice to be given of the meeting to hear objections and revise and correct the assessments, and to act as a board of equalization. Such a notice was given by the city clerk. But of what avail would be a ·more special notice ? The property owners could not defeat ·this exercise of power by the board, and notice would have availed nothing.''

(See also Foster v. Rowe, 128 Wis. 326, 107 N. W. 635, 8 Ann. Cas. 595 ; Ray v. Armstrong, supra.) In the case of Bi-Metallic Inv. Co. v. State Board of Equalization, 239 U. S. 441, 36 Sup. Ct. 141, the court said :

''For the purpose of decision we assume that the constitutional question is presented in the baldest way—that neither the plaintiff nor the assessor of Denver, who presents a brief on the plaintiff's side, nor any representative of the city and county, was given an opportunity to be ·heard, other than such as they may have had by reason of the fact that the time of meeting of the board is fixed by law. * * * The question then is, whether all individuals have a constitutional right to be heard before a matter can be decided in which·all are equally concerned—here for instance, before a superior board decides that the local tax officers have adopted a system of undervaluation throughout a county, as notoriously often has been the case. The answer of this court in the State R. Tax cases, 92 U. S. 575, 23 L. Ed. 663, at least, as to any further notice, was that it was hard to believe that the proposition was seriously made. Where a rule of conduct applies to more than a few people it is impracticable that everyone should have a direct voice in its adoption. The constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point

of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. If the result in this case had been reached, as it might have been, by the state's doubling the rate of taxation no one would suggest that the 14th amendment was violated unless every person affected had been allowed an opportunity to raise his voice against it before the body entrusted in the State Constitution with the power. In considering the case in this court we must assume that the proper state machinery has been used, and the question is, whether if the state constitution had declared that Denver had been undervalued as compared with the rest of the state, and had decreed that for the current year the valuation should be 40 per cent higher, the objection now urged could prevail. It appears to us that to put the question is to answer it. There must be a limit to individual argument in such matters if government is to go on."

We think the foregoing case is decisive of the question here. The principles involved are the same, namely, whether after the local boards of equalization have equalized the property, every tax payer affected having full opportunity to be heard, a horizontal increase, involving the property of a large number of people, may be made by the State Board of Equalization without further notice, and the court, in the foregoing case, held that it may do so, and that no such notice is necessary to be given. The fact that in the case from which we have quoted the time of meeting of the board was fixed by law, was not, we think, given any controlling weight in determining the general principle above stated. Nor do we think that there is any material difference in that respect between that case and the case at bar, as we shall proceed to show.

(b). We have seen that no notice is required whenever the statute fixes the time and place of meeting of the State Board of Equalization. We think that this rule is substantially applicable in this state. The state board has its ses-

sions at the capital of the state. It is, under the statute, in
continuous session. While the law does not specifically pro-
vide that a tax payer may appear before it, enter his com-
plaint and be heard, there is nothing in the law denying that
right, and such right, since the board is a public board, with
its session open, should, we think, be held to be implied. (26
R. C. L. 345; Kentucky R. Tax Cases, 115 U. S. 321, 29 L.
Ed. 414, 6 Sup. Ct. 57; Road Imp. District v. Glover, 86
Ark. 231, 110 S. W. 1031; Hill v. Johnson, 82 Kans. 813,
119 Pac. 163.) The law specifies when the returns of the
assessment rolls in the various counties shall be sent and
laid before the board, and while no definite date is fixed
when the board must take up the consideration of these re-
turns, the law implies that this must be done promptly upon
the receipt thereof and the consideration thereof must be
completed within a reasonable time. Hence we are not pre-
pared to say that the tax payers of this state do not have
substantially the same opportunity to appear before the
board and protect their rights as in cases where a more
definite date is fixed by law. In either case, the opportunity
is imperfect and no doubt unsatisfactory. In either case the
opportunity afforded would be but seldom embraced. That
would be true even in case the opportunity were much more
ample. In any event the opportunity to appear and be
heard exists, and as said in Lander v. Mercantile Co., supra,
those interested and desirous to be heard may, by a little ef-
fort, find out when the board would be likely to take up the
consideration of the return in question. It is true that in
State v. Leech, supra, an opportuity for hearing of the char-
acter above described was held insufficient and violative of
due process, and we think rightly so, as applied to the facts
in that case. But that was a case where the State Tax Com-
mission attempted to make original and individual assess-
ments against some light and power companies, and no no-
tice was given or hearing had of the assessments, and no
opportunity for such hearing had been provided by law
either as to the assessment or as to correction or equaliza-

tion thereof. But here the assessment was made by an assessor, full opportunity for a hearing to have adjustments made before the county board of equalization existed, tne state board acted as a board of equalization, not as a board of assessment, made the increased valuation horizontally, affecting a large number of people, making it impracticable to give them all a personal notice, and surely the requirement as to due process of law must in such case be different and less rigid than under the facts as exhibited in the North Dakota case. In the case of Lander v. Mercantile Co., supra, it seems that the third Tuesday of June was the time set for the meeting of the State Board of Equalization. The board met on that day, and transacted no business except to adjourn, not to a date certain, but at the call of the president. It met again on the 10th and 20th of September and adjourned in a similar manner, without action as to plaintiff's property. It met again on December 4th, and then increased the valuations of the plaintiff. No notice of any of these adjournments was given plaintiff, and it had no knowledge of the action of the board until after December 4th. The court, after speaking of the principle that no notice need be given where a definite time and place is set for the meeting of the board, said:

"We do not think the principle of those cases is affected by an adjournment of the Ohio board without fixing a date of meeting. How were the rights of the bank affected and to what inconvenience was it put? It did not appear at the first meeting of the board. It rested on the evidence it had returned to the auditor, and it knew that the report it had made to the comptroller of the state would be before the board, and it knew also the duties and power of the board. The board was a public tribunal, open to be invoked, and charged with duties, and necessarily subject to adjournment. What it had done the bank could have easily ascertained, and as easily what it contemplated doing. Any inquiry would have ascertained both. By the exertion of a

very trifling trouble the bank would have, been informed of every meeting of the board.''

· ·"We shall not take the time and space to go into a more detailed examination of this case, but a careful reading thereof will show that no better opportunity for a hearing was afforded in that case than in the case at bar; in fact, we think that the opportunity afforded in that case was not as great as here. (See also Chicago & N. W. R. Co. v. The State, 128 Wis. 553, 654.)

. We deduce from the foregoing the following: Where a rule of conduct applies to more than a few people, it is impracticable to give every one affected a voice in its adoption, and it is doubtful that any opportunity for a hearing is necessary to be given in such case. If such opportunity is necessary to be afforded at all, it needs in any event to be reasonable only, and as to what is reasonable depends on the nature of the case. That reasonable opportunity to be heard is, we think, given under the laws of this state in connection with the equalization of property by the State Board of Equalization, and its action with that end in view is not violative of due process of law.

7. It is insisted that the State Board of Equalization, in order to exercise the rights granted it by law, must adopt rules and regulations pursuant to the provisions of Section 2810, supra. We have already seen that the board in fact adopted some regulations in classifying lands. That was done, perhaps, informally by adopting a uniform blank for the returns of the assessments, but the law does not specify the manner in which such rules and regulations shall be adopted. It is apparent from a reading of the section of the statute cited that in many matters no rules or regulations are necessary. The statute, for instance, prescribes that the board shall examine the returns of the assessments and make a comparison of the valuations and equalize property. No rule could add to the duty thus prescribed or power granted. We have not been cited to any particular rule which should have been adopted for the safety of tax payers,

and we do not think that the absence of any further rules and regulations furnishes the plaintiffs in this case upon the facts here involved, any ground for an injunction herein.

Finding no reversible error in the record, the judgment of the court below accordingly should be and the same is hereby affirmed.

*Affirmed.*

Potter, Ch. J., and Kimball, J., concur.